**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 13 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 03-1354

JEFFREY S. FINN,

Defendant-Appellant.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 01-CR-184-WM)**

---

Michael P. Zwiebel (Harvey A. Steinberg with him on the briefs), Springer and Steinberg, P.C., Denver, Colorado, for the defendant-appellant.

Andrew A. Vogt, Assistant U.S. Attorney (John W. Suthers, United States Attorney, with him on the brief), Denver, Colorado, for the plaintiff-appellee.

---

Before **BRISCOE**, **O'BRIEN**, Circuit Judges, and **HEATON**, District Judge.[*]

---

**BRISCOE**, Circuit Judge.

---

[*] The Honorable Joe Heaton, United States District Judge for the Western District of Oklahoma, sitting by designation.

Defendant Jeffrey Finn, a former special agent with the Office of the Inspector General of the United States Department of Housing and Urban Development, appeals his conviction of knowingly and willfully making a false statement, in violation of 18 U.S.C. §§ 1001(a)(3) and 2. On appeal, Finn argues, in pertinent part, that the evidence presented at trial was insufficient to satisfy the materiality requirement of § 1001(a)(3). Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we agree. Accordingly, we reverse Finn's conviction and remand with directions to the district court to enter judgment of acquittal in his favor.

## I.

In approximately 1994, the United States Department of Housing and Urban Development (HUD), through its Office of Inspector General (HUD-OIG), implemented "Operation Safe Home" (OSH) to help federal, state, and local law enforcement officers identify, investigate, and prosecute individuals engaged in illegal activity, particularly drug and gun-related crimes, in or near public housing areas. Unlike many other federal programs, OSH was not created by a specific federal statute but was a presidential initiative funded by Congress through the budget for the Public Housing Drug Elimination Program. The money provided by Congress for OSH was distributed by HUD-OIG to the various districts throughout the country that were involved in the OSH program. Although HUD-OIG established rules regarding how the OSH funds should be spent, until their revision in early 2001, those rules were extremely general and essentially

afforded each district the autonomy and authority to spend the funds as they saw fit.

In December 1997, Finn became the special agent in charge (SAC) of HUD-OIG's Rocky Mountain District, which was headquartered in downtown Denver and encompassed the states of Colorado, Utah, Wyoming, Montana, North Dakota, and South Dakota. Finn was responsible for implementing the OSH program in his district and, accordingly, for obtaining OSH funding from HUD-OIG headquarters and monitoring the OSH operations in his district.

On March 20, 2000, Finn parked his government-issued Ford Expedition in the loading dock area of the high-rise building in which his office was located.[1] Although it is unclear from the record precisely when Finn parked his vehicle, it is uncontroverted that it remained in the loading dock area most of that day. Because the building management generally imposed a 30-minute limit on vehicles parking in the loading dock area, the building engineer contacted the director of HUD's Denver offices and advised him that Finn's vehicle would be towed. The building engineer then contacted Arapahoe Recovery between 2 and 3 p.m. that afternoon and asked them to tow Finn's vehicle.

---

[1] HUD's Denver offices were located in a high-rise building located at the corner of 18th and California Streets. Those offices were apparently leased to HUD prior to implementation of the OSH program, and it is uncontroverted that they were not particularly well-suited to law enforcement use. In particular, HUD employees were allocated parking spaces in a nearby parking garage, which required Finn and his special agents to either take arrestees through the front lobby of the building (which was frowned upon by the building owner), or park in the loading dock area and take them through the freight entrance.

Arapahoe responded between 5 and 6 p.m. that day and towed Finn's vehicle to its storage lot in Englewood, Colorado.

Finn, accompanied by his secretary and an office intern, left his office building that evening at approximately 6 p.m. and discovered his vehicle was missing. Suspecting that his vehicle had been towed, Finn telephoned Arapahoe, using a phone number listed on a sign posted in the loading dock area. Robert Winter, the co-owner of Arapahoe, answered Finn's call and confirmed that Finn's vehicle had been towed. According to Winter, Finn was irate and did not want to pay to recover his vehicle. More specifically, Finn allegedly stated to Winter: "I am a fucking fed and you can't tow my car and you are going to have to give it back." App. at 1638-39. Winter told Finn he would have to pay for the vehicle (in cash) and, in accordance with normal business practice, directed Finn to meet him at a restaurant located near Arapahoe's storage lot.

Finn, accompanied by his office intern, met Winter at the restaurant later that evening. Although still allegedly belligerent, Finn agreed to pay Winter to recover his vehicle. Finn and his intern followed Winter to Arapahoe's storage lot. After the three men entered the storage lot, Winter, again in accordance with normal business practice, parked his tow truck in the entrance to the driveway to prevent Finn and his intern from taking Finn's vehicle without payment. Finn approached the tow truck and, after flashing his badge and informing Winter he was a federal agent, stated the towed vehicle "had weapons in it, and he needed to take it and that he wasn't going to pay for the tow now."

4

Id. at 1645.  In response, Winter told Finn he could not take the vehicle without paying for it and if he tried to do so Winter would call the police.  Finn told Winter, "I am a fucking fed and you can't keep my car," walked to his vehicle, started it, and proceeded to leave the storage lot by driving over a two-foot chain fence that surrounded the lot.  Id. at 1646.  The tires of Finn's vehicle broke a chain that was welded to two fence poles and bent one of the fence poles.  Finn called his intern on his cell phone and directed him to follow him to his home.  At Finn's home, he directed the intern not to talk to other employees at the office about the incident.  Meanwhile, Winter contacted the Englewood Police Department and an officer responded to the storage lot and took a report of the incident.  The co-owner of Arapahoe, Amy Hackett, also called Finn's cell phone and asked him to return her call.

After arriving home, Finn telephoned the home of Cortez Richardson, a HUD-OIG special agent who worked at the Denver office under Finn's supervision.  Finn asked Richardson to check with the local police and see if there had been a police call involving Finn's official vehicle.  Richardson telephoned Ray Marquez, a Denver police officer who worked on the OSH task force, who informed Richardson there had been a police call in Englewood involving Finn's vehicle.  Richardson then called the Englewood Police Department and spoke with the officer who handled the call.  Richardson called Finn and informed him the Englewood police wanted Finn to come to the station and clear up the matter or he would be arrested.  Finn asked Richardson to go to the storage

5

lot and pay the bill. When Richardson responded that he did not have the money to do so, Finn directed him to use government funds because Finn considered it to be a government expense. The following morning, Richardson took $500 in cash from the office "cash box." The cash box contained OSH funds used by the office for investigative and other expenses. Richardson went to Arapahoe's storage lot and paid Winter a total of $350, $200 of which was to cover the damage caused by Finn to the fence pole and chain, and received a written receipt. Richardson then drove to the Englewood Police Department and left a copy of the receipt.

Richardson returned to the HUD-OIG office and began filling out a case expenditure form to document the expense. According to Richardson, special agents were required to complete case expenditure forms and, if possible, attach receipts when they used funds from the cash box. As he was doing so, Finn appeared and asked to see the receipt from Arapahoe. Noting the portion of the receipt that listed damage to the fence, Finn stated "That can't be there." Id. at 1722. According to Richardson, Finn was embarrassed by that portion of the receipt and indicated it would "make him look bad." Id. at 1723. At Finn's direction, Richardson altered the receipt to omit the reference to damage to the fence and, in its place, wrote the word "Storage." Id. at 1724. Richardson attached the altered receipt to the case expenditure form, on which he wrote "Vehicle Towing & Storage," and placed it in the office's filing system. Id. at 1725, 1727. In the cash receipts book that accompanied the cash box, Richardson also wrote "Vehicle

Expense." Id. at 1731.

On May 22, 2001, Finn was indicted in connection with the events outlined above. Count 1 of the indictment alleged that on March 21, 2000, Finn "embezzled, stole and knowingly converted to his own use and the use of another approximately $200.00 of money of the United States," in violation of 18 U.S.C. §§ 641 and 2. Id. at 15. Count 2 alleged that on March 21, 2000, Finn knowingly and willfully "made and used a false writing and document," i.e., a HUD expenditure form, in violation of 18 U.S.C. §§ 1001(a)(3) and 2.[2] Id. at 16.

The case proceeded to trial on July 29, 2002. Finn moved for acquittal at the close of the government's case. The court reserved ruling on Finn's motion. At the conclusion of all the evidence, Finn again moved for acquittal and the court again reserved ruling. The case was submitted to the jury. The jury acquitted Finn on Count 1 (embezzlement) but convicted him on Count 2 (use of a false writing). The district court subsequently denied Finn's motion for judgment of acquittal. On August 1, 2003, the district court departed downward from an offense level of 10 to an offense level of 8 based upon aberrant behavior (U.S.S.G. § 5K2.20), and did not impose a sentence of imprisonment, but did impose a fine of $1,000.

---

[2] The indictment contained four additional counts arising out of Finn's alleged misuse of sick leave. Those four counts were subsequently dismissed by the district court due to the government's destruction of relevant and potentially exculpatory evidence and are not at issue in this appeal.

## II.

*Sufficiency of evidence - "materiality"*

Finn contends the evidence presented at trial was insufficient to support his conviction for making and filing a false statement in violation of 18 U.S.C. § 1001. "In reviewing the sufficiency of the evidence to support a conviction or a denial of a motion for judgment of acquittal, we review the record de novo to determine whether, viewing the evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty of the crime beyond a reasonable doubt." United States v. Colonna, 360 F.3d 1169, 1178 (10th Cir. 2004). Because Finn moved for judgment of acquittal at the close of the government's evidence and the district court reserved ruling on that motion until after trial, we must decide the sufficiency question "on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b); see also id., Advisory Committee Notes to 1994 Amendments (noting appellate courts are bound by same rule). In other words, we must decide the sufficiency question solely on the basis of the evidence presented by the government and without regard to the evidence presented by Finn.[3] See United States v. Wahl, 290 F.3d 370, 374-75 (D.C. Cir. 2002) ("We recognize Rule 29(b)'s instruction that any ruling must be decided on the basis of the

_____

[3] Although it is not entirely clear from the record, it appears the district court ultimately failed to follow the directive of Rule 29(b) in ruling on Finn's initial motion for judgment of acquittal. More specifically, it appears the district court took into account all of the evidence, including the testimony of defense witnesses, in denying the motion.

evidence presented at the time the ruling was reserved."); United States v. Velasquez, 271 F.3d 364, 370 (2d Cir. 2001) (discussing Rule 29(b)).

To obtain a conviction for making a false statement in violation of § 1001, the government must establish the following elements beyond a reasonable doubt: (1) the defendant made a statement; (2) that was false and the defendant knew it was false; (3) the statement was made knowingly and willfully; (4) the statement was made within the jurisdiction of a federal department or agency; and (5) the statement was material. See United States v. Kingston, 971 F.2d 481, 486 (10th Cir. 1992). Finn challenges only the fifth element -- materiality. According to Finn, there was no evidence that the altered statement on the tow receipt (changing the reference to "storage") was "material." Indeed, Finn asserts that "the evidence was uncontroverted that the misstatements in the receipt attached to the case expenditure form were not capable of influencing any specific decision that HUD was required to make." Aplt. Br. at 22.

In Kungys v. United States, 485 U.S. 759, 770 (1988), the Supreme Court held that to be "material," the statement at issue must have "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed." More recently, in United States v. Gaudin, 515 U.S. 506, 509 (1995), the Court not only reaffirmed this definition, but provided the following guidance for its application:

> Deciding whether a statement is "material" requires the determination of at least two subsidiary questions of purely historical fact: (a) "what statement

9

was made?" and (b) "what decision was the agency trying to make?" The ultimate question: (c) "whether the statement was material to the decision," requires applying the legal standard of materiality . . . to these historical facts.

Id. at 512.

Applying this analytical framework to the case at hand, we have no doubt that the evidence presented by the government during its case-in-chief would have allowed the jury to reasonably answer the first subsidiary question of historical fact ("what statement was made?"). In particular, the uncontroverted evidence presented by the government at trial indicated that the "false statements" at issue were the references to "storage" on the case expenditure form and the altered receipt from Arapahoe.

We turn to the second subsidiary question of historical fact outlined in Gaudin ("what decision was the agency trying to make" in connection with the case expenditure form at issue?). In its appellate brief, the government points to the following items of evidence which, it contends, are relevant to this question and, ultimately, to the alleged "materiality" of the false statements:

* "that Operation Safe Ho[me] funds were subject to audit";

* "that the Operation Safe Home operations manual specifically provided for such audits";

* "that an audit of Operation Safe Home funds would necessarily entail a review of the documentation of all expenditures of the funds, including the falsified documentation of the $200 expenditure, in order to determine whether the funds were expended for a proper purpose";

* "that a valid audit determination of whether Operation Safe Home funds

10

were spent for a proper purpose in furtherance of the program depends on a determination of the true purpose for which the funds were expended";

* "that an examination of the falsified documentation would mislead an auditor as to the true purpose for which the $200 was expended";

* "that [Finn's] performance and exercise of judgment as a special agent in charge was subject to evaluation through comprehensive management assessment review of Operation Safe Home by HUD headquarters and at all other times by his supervisors";

* "that any appraisal of [Finn's] performance and exercise of judgment would depend on the accuracy of the records in the Denver office, and that such reliance on the accuracy and truthfulness of the falsified record would have resulted in the evaluators being deceived and misled."

Aplee. Br. at 28-29.

We agree with the government that this evidence was presented at trial, demonstrates the intended use of the case expenditure forms, and thus may have been sufficient to support a finding of "materiality."[4] Importantly, however, the government

---

[4] There was no evidence presented at trial indicating the false statements influenced, or were even capable of influencing, the agency with respect to the propriety of or justification for the payment itself. All of the relevant prosecution and defense witnesses (e.g., Cortez Richardson, Phillip Kesaris, and Michael Stolworthy) agreed that use of OSH funds for the damage to the fence was proper. Kesaris and Stolworthy (both defense witnesses) also testified that the expenditure would have been authorized even if such alteration had not been made. Kesaris further testified that the propriety of an expenditure was determined based on the actual facts, without regard to what was written on the expenditure form, and that, in fact, no one at HUD ever examined the documents at issue to determine the propriety of the expenditures. There was no contrary testimony.

The evidence emphasized by the government in its appellate brief suggests that more peripheral agency decisions could have been made based upon the case expenditure forms. In particular, the evidence suggests that Finn was subject to performance appraisals by his supervisors and that the false statements at issue might have been capable of influencing those appraisals by effectively hiding from Finn's supervisors

11

overlooks one critical fact: all of this evidence was presented <u>after</u> the government had rested its case, <u>after</u> Finn had moved for judgment of acquittal, and <u>after</u> the district court had reserved ruling on that motion. In particular, this testimony was elicited during direct and cross-examination of defense witness Phillip Kesaris (who, at the time of the relevant events in this case, was the Assistant Inspector General for investigations at HUD-OIG and was Finn's second-line supervisor). As noted, Federal Rule of Criminal Procedure 29(b) and its commentary expressly prohibit us from considering Kesaris's testimony in assessing the sufficiency of the evidence to support Finn's conviction on Count 2 since Finn moved for judgment of acquittal at the conclusion of the government's evidence and the district court reserved ruling on that motion.

In a fall-back position briefly mentioned in its appellate brief and more heavily emphasized at oral argument, the government directs us to the testimony of two government witnesses, Cortez Richardson and John Raney. Richardson, the special agent who prepared the case expenditure form at issue, testified on direct examination that Denver task force members were supposed to complete and file a case expenditure form whenever they used funds from the cash box and, if possible, attach any relevant receipts to the form. Richardson further testified that at some point during Finn's tenure as SAC, Finn hired an "independent auditor" to look at the office books because HUD's audit

---

what clearly could be viewed, at a minimum, as conduct unflattering toward the government in general, and the agency in particular.

12

division "was not performing the semi-annual audits that they were required to do." App. at 1729. According to Richardson, this independent auditor examined the case expenditure form at issue. On redirect, Richardson acknowledged HUD had an audit division that was supposed to inspect HUD-OIG records. At no point, however, did Richardson testify as to the nature or purpose of such audits or inspections (and indeed it is far from clear that Richardson was qualified to testify as to the nature or purpose of such audits).

John Raney was a special agent in HUD-OIG's Denver office who had been assigned the role of "district agent cashier." Id. at 1813. Raney testified on direct examination that he reconciled the case expenditures on a monthly basis to "make sure that everybody came out with equal expenditures versus receipts and whatnot." Id. Raney further testified he was "responsible for submitting paperwork or at least generating the paperwork that was submitted" to HUD's accounting office in Fort Worth, Texas (which allocated OSH funds to the district offices), in order "to have investigative funds brought into [the office's] main checking account." Id. at 1813-14. On redirect, Raney testified that, after Finn left the Denver office, Raney assisted HUD's audit division in performing an "overall audit" of the office books (apparently as part of an internal affairs investigation of Finn). Id. at 1827. Importantly, however, Raney testified that it "was specifically not part of the[] scope" of the audit to examine the propriety of the expenditures listed in the case expenditure forms. Id. at 1828. Instead, Raney

13

explained the purpose of the audit was simply "to account for the money coming into the district and then where it went once it came into the district." Id. In other words, Raney testified that the purpose of the audit was merely to "balance" the district's books. Id.

In our view, neither Richardson's nor Raney's testimony was sufficient to allow a reasonable finder of fact to determine what decision, if any, HUD was trying to make in connection with the case expenditure form at issue. Although it is uncontroverted that the case expenditure form and the attached altered receipt fell generally within the jurisdiction of HUD-OIG, the prosecution's evidence failed to address the purpose or use of case expenditure forms from the agency's perspective (other than to explain that the numbers on the forms were used to "balance" the district's "books"). Moreover, because the government's evidence established that Finn, as SAC for the Rocky Mountain District, had been allocated the authority to determine the propriety of expenditures of OSH funds, the only inference that reasonably could be drawn by a finder of fact from the government's evidence was that no decisions were made by HUD with respect to the case expenditure forms or receipts after they were prepared and filed. In other words, a finder of fact reasonably could not have inferred from the government's evidence that HUD at any time could or would have examined the case expenditure form at issue for the purpose of determining the propriety of the underlying expense or for any other articulated purpose.

Having concluded the evidence presented by the government was insufficient to

allow a finder of fact to determine the critical underlying historical facts, we in turn conclude the government's evidence was insufficient to allow the jury reasonably to find that the false statements at issue were "material." Thus, Finn's conviction on Count 2 must be vacated and the case remanded to the district court with directions to enter a judgment of acquittal with respect to Count 2. See generally United States v. Wilson, 182 F.3d 737, 744 (10th Cir. 1999) (ordering similar relief).

REVERSED and REMANDED with directions to enter a judgment of acquittal with respect to Count 2 of the indictment.